[Civil No. 2612.   Filed October 17, 1927.]

[260 Pac. 191.]

TOM REED GOLD MINES COMPANY, a Corporation, Appellant, v. JOE BERD, Appellee.

Mr. L. L. Wallace, for Appellant.

Mr. S. D. Stewart, for Appellee.

ROSS, C. J.—The plaintiff, Berd, in a suit under the Employers' Liability Law, chapter 6, title 14, Civil Code of 1913, obtained a verdict and judgment against the defendant, Tom Reed Gold Mines Company, for the sum of $10,000, and from an order overruling a motion for a new trial and from the judgment, the company has appealed.

The accident, in which plaintiff claims he was hurt, occurred August 9th, 1924, in the 400-level of the Katherine mine, Mohave county. At the time he was lifting a drilling machine, weighing about 150 pounds, for the purpose of removing it from the danger zone of some blasts about to be put off, and while in such act his feet slipped and the drilling machine, as he alleges, struck him in the abdomen and groin and about the hips and legs and injured him internally and in his back, spine, hips and certain nerves, muscles and tissues of his body, permanently disabling him, etc.

The first six assignments of error are based upon the misconduct of plaintiff and his counsel during the trial. The seventh is that the jury acted under the influence of bias, passion, and prejudice, induced by such misconduct, and rendered an excessive verdict. We do not find it necessary to consider the other assignments, and therefore do not state them. We will consider those mentioned in the order stated.

This is a second trial, the first trial being had in November, 1925, and this one in June, 1926. In the first trial plaintiff was successful before the jury, but for some reason the verdict was set aside and a new trial granted. It would seem, therefore, that unless the errors complained of are clearly prejudicial the verdict and judgment should not be disturbed.

(1) It is claimed defendant's rights were prejudiced by a statement of plaintiff while testifying, to the effect that defendant had caused a witness of plaintiff's to absent himself from the trial. To begin with, plaintiff, as the record clearly shows, is an illiterate, uneducated foreigner. From his answers it is apparent he had difficulty in understanding questions put to him and, likewise, in making himself understood. He was asked by his attorney if

other men were working on the 300-level at the time he was hurt and in answer to the question he said there were. And to the further question, "Do you know where he is now?" (referring to one of such workmen), he answered, "He was the other day; he was in; but the company take him away from me before last night." The plaintiff had no grounds for making such an accusation. It appears from the record that it was an assertion without any supporting evidence. That an insinuation or assertion that the adversary had secured the absence of the witness was improper is obvious. Untrue and unsupported statements of the kind in the presence of the jury were certainly calculated to do harm and deserve, whether volunteered by the witness or solicited by counsel, the severest condemnation. Such misconduct has been held sufficient to require a reversal of judgments (*Ashland, etc., v. May*, 51 Neb. 474, 71 N. W. 67, and *Missouri, etc., v. Wood*, 26 Tex. Civ. App. 500, 63 S. W. 654) when the guilty party was not rebuked nor the jury admonished by the court not to be influenced by it. But in this case the court ordered the answers stricken and told the jury to disregard them. It was rectified so far as the court was able to rectify it, and with an honest and intelligent jury we think we should assume wholly so.

(2) The plaintiff was asked by his counsel if one Murphy rubbed him with liniment, and he answered, "No, sir; my wife did." The defendant objected to the answer, moved that it be stricken, and the jury instructed to disregard it. It now contends that a failure to grant its motion was error. In support of this contention defendant cites the rule announced in *Silver King v. Kendall*, 23 Ariz. 39, 201 Pac. 102, wherein it was said that evidence that plaintiff had a dependent wife and daughter was, under the Employers' Liability Law, irrelevant, and, since such

evidence would tend to excite the sympathy of the jury for the plaintiff, it was prejudicial. But in that case the record shows that the evidence was offered and admitted for the purpose of enhancing the verdict. If the situation here were the same, the rule would be the same. The statement by plaintiff that his wife rubbed him, if the question was proper, was also proper. That plaintiff had a wife was brought out incidentally and not for the purpose of augmenting the verdict or winning the sympathy of the jury. To extend the rule to hold that such accidental disclosure was injurious would be going too far, we think.

(3) The plaintiff sought to put before the jury, by questions propounded to him by his counsel, his financial condition at the time of the accident and during the interim to the time of trial. For instance, he was asked if he had any money saved up, how he had managed to live, if he made any money trying to farm or in the store business, if he had been able to make a livelihood, to which questions he made answer, in effect, that he had some money when hurt, but had since spent it; that his efforts to make a livelihood had been futile; that his living had been poor; and that he had borrowed, or tried to borrow, from friends. These questions and answers were foreign to the issue. The plaintiff had asked in his complaint for damages for permanent injuries only. He alleged no special damages, as for loss of wages, or for medical care, or otherwise. The evidence should have been confined to the issue. The defendant either interposed objections to these questions or moved that the answers thereto be stricken and the jury instructed to disregard them, which objections and motions were uniformly sustained by the court. In one or two instances the court stated in ruling out such evidence that the question was

whether or not the plaintiff's earning capacity had been decreased by reason of the alleged injuries.

The persistence of plaintiff's counsel in repeating these questions after the court had ruled thereon was almost contemptuous and exhibited a contentiousness that is unpardonable; and, if it were in our power to inflict punishment upon the attorney without condemning at the same time his client, we would be inclined to do so. Evidence of poverty in cases of this kind should never be allowed. The damages recoverable depend upon the nature of the injury sustained and not upon the wealth or poverty of the plaintiff. *Johnston* v. *Beadle,* 6 Cal. App. 251, 91 Pac. 1011; *Green* v. *Southern Pac. Co.,* 122 Cal. 563, 55 Pac. 577; 17 C. J. 872. But, in view of the rulings of the court, we do not feel that we would be justified in holding the errors prejudiced the defendant's case.

(4) One Murphy had testified in behalf of the plaintiff. On account of his intoxicated condition, defendant, in the absence of the jury, moved that his testimony be stricken, which was consented to by plaintiff. However, when the court in the presence of the jury granted defendant's motion, counsel for plaintiff stated:

"We have no objection, and at this time we wish to have the record show that it is our loss rather than our gain."

This remark of counsel is assigned as misconduct and prejudicial. We agree that counsel in consenting to the expunging of the Murphy testimony was, in good practice and ethics, forestalled from making adverse comment thereon. He showed himself a poor sport and evinced a disposition "to blow hot and cold" at the same time, for which he should have been rebuked by the court. But, again, we are not satisfied it affected the jury's verdict.

(5) The defendant complains of the court's refusal to dismiss the jury and declare a mistrial for misconduct of plaintiff while a witness. After the jury was impaneled and sworn to try the case, plaintiff was placed upon the stand to testify in his own behalf. His counsel asked questions of him and he made answer as follows:

"Your name is Joe Berd?

"Yes, sir.

"And you are the plaintiff in this case, Mr. Berd?

"Can't talk.

"What is that? You are the plaintiff, the man named as the plaintiff in this action against Tom Reed?

"I understand all right. I can't talk.

"Perhaps he doesn't understand. Beg pardon? How old are you, Mr. Berd?

"I can't talk—nervy.

"Beg pardon?

"I will pretty quick.

"Now, Joe, if you will just take your time. Maybe you are a little alarmed at being on the witness stand. Maybe you are a little alarmed. I think I will ask you the question again.

"Please let me go."

At this point, because of the condition and behavior of plaintiff, the court suggested that a recess be taken, which was done. At the resumption of the trial the following day defendant moved that a mistrial be declared and the jury discharged because the plaintiff, when called to testify the day before, by his demonstration of weeping, wailing, and his motions, and all, had unfairly impressed the jury, making it impossible for the defendant to have a fair trial. In passing upon the motion and in refusing to grant it, the court said:

"I do not think that the demonstration was intentional at all, but I do think it is a very unfortunate situation to put before a jury—to have occurred. I do not think it was intentional on the part of coun-

sel. I think counsel was just as much surprised as I was; and I do not think it was intentional on the part of the plaintiff.''

"It was a very unusual incident to have appeared in the courtroom, and it is quite a question as to what effect it would have on the minds of the jury.''

" . . . So far as it being intentional, I do not think it was. I think the man was highly nervous and sick. He should be drawing a thousand dollars a week from the movies.''

Theatricals in a court of justice are to be deplored. A litigant witness should make no unseemly demonstration nor affect or assume conduct whose only tendency is to excite the sympathy of the jury or the court. Whether his action was spontaneous and uncontrollable, or feigned, it was certainly highly exciting, so much so as to cause the presiding judge to remark his fitness for moving pictures at the handsome salary of a thousand dollars a week.

We think with the trial judge plaintiff's conduct was unfortunate, but the human equation enters into every trial. It is a well-known fact that juries hesitate to condemn young and beautiful women defendants. It is also known that such defendants affect mannerisms and also dress to excite or win sympathy. While juries refuse to convict such defendants, if they are plaintiffs, asking for damages for the death of a husband, large verdicts result. All litigants are actors and say and do the things, according to their lights, most likely to win favor for their cause. Whether the plaintiff was affecting hysteria or was sincere was a question for the jury. If he put on his demonstration of weeping and wailing to win sympathy, the jury, as common-sense men, could possibly detect it, and, if honest men, reject it. If, on the contrary, his action was uncontrollable, they might sympathize for him and still be guided by the evidence on the issue of his claim for damages for injury. Counsel cite us to no case in-

volving facts like the ones here, and after some search we have been unable to find any.

While we are impressed that the rule just stated is sound and should be generally followed, we cannot but feel that in the exercise of a sound discretion the court might well have discharged the jury and called another, free from the possible unmerited sympathy that might have been occasioned by the unfortunate conduct of plaintiff. No doubt, the impression made by plaintiff's conduct lingered with the jury throughout the case, and, honest men though they were, might have been a determining factor in their verdict. However, the court felt otherwise. He had the whole situation under observation, and we do not feel that we would be justified in reversing the case because he failed to do what we under the circumstances think we would have done.

(6) Misconduct of plaintiff is charged, in that during the trial, both while he was testifying as a witness and while he was not a witness, he constantly and repeatedly reclined upon the floor in a sitting posture, with his back against the railings, in plain view of the jury, and from time to time would get up in his chair and again recline on the floor. That plaintiff did these things there can be no question. The statement of his conduct was dictated into the record by defendant's counsel and approved by the court. That the court observed his actions is evidenced by this question and answer:

"Joe, can't you sit up on the witness chair?
"I feel whole lot better over here because I am too nervous. Nervous, nervous all the time."

Again, when defendant was making a record of plaintiff's conduct, the court said:

"I noticed the plaintiff sitting there on the floor several times, and I wondered why counsel for either side didn't say something about it. I didn't mention

it because I didn't want to interfere in the case, but it is very unusual."

From the record, we have a plaintiff, at the very beginning of the trial, creating a scene of an unusual kind by cries and wails and asserted inability to talk, compelling a court recess, bad enough in itself, but which the court, in its discretion, held insufficient to discharge the jury and declare a mistrial. Then, upon the resumption of the trial, and throughout the trial, we find the plaintiff leaving the witness chair, proclaiming to the jury that he was nervous, and reclining upon the floor and against railings. Perhaps it should be granted it was the duty of defendant to have complained to the court of this conduct and insisted on plaintiff's remaining in the witness chair while testifying and in a chair beside his counsel when not on the stand, instead of doing the unusual and unseemly thing of sitting and reclining upon the floor, and thus impressing the jury that his actions were necessary because of his injured condition. But by failing to call the attention of the court to what was palpably a violation of decorum, as easily seen and understood by the court and plaintiff's counsel as anyone else, did the defendant waive such misconduct? We think it was more the duty of plaintiff's counsel and the court to see that plaintiff properly demeaned himself than it was the defendant's duty. The defendant had no control over plaintiff, whereas, presumably, his counsel did. The court could have compelled plaintiff to properly conduct himself, and, what is more, it was the court's duty, without being asked to do it, to demand and require orderly conduct of plaintiff. The record fails to show that it was necessary for plaintiff to sit or recline on the floor and against railings, or that it was even more comfortable for him to do so, unless his oft-repeated assertion that he was nervous established that fact.

It does appear from his testimony that after his injury he was able to move about, drive an automobile, do some farming and storekeeping; that he went to Phoenix and conducted a store some six or seven months, between the time of the alleged injury and March, 1925; in fact, while he says he was suffering all this time he was, we gather, fairly active.

We conclude, not for one, but for the many errors that have crept into the record, the defendant is entitled to a new trial free from these errors. We have the more readily come to this conclusion for these reasons: The injury of which plaintiff complains is internal and invisible. An X-ray picture taken in August, 1924, shortly after he claims he was injured, was negative in its findings; likewise one taken in November, 1925. Dr. White, of Kingman, who took both pictures, testifying for the defendant, said he made a cursory examination of plaintiff in August, 1924, when he took the first picture, and that he did not think plaintiff had on his person any black and blue spots, or cuts, or contusions, and that there were no visible evidences of injury when the last picture was taken in November, 1925, but that plaintiff gave some evidence of tenderness in his back.

Dr. Todt, also of Kingman, saw the picture taken in November, 1925, and, testifying for plaintiff, agreed with Dr. White that it showed nothing the matter with plaintiff, but stated that in the examination they (he and Dr. White) found plaintiff had an exaggerated knee reflex due to nervous irritation, and there is evidence that this nervous condition might have been caused by the accident plaintiff claims to have suffered.

The injury complained of could not be seen or photographed; it was invisible, hidden. Notwithstanding, it might have been real. If so, it was capable of proof, and, like any other fact necessary

to a cause, should be established by competent and relevant evidence. It could not be exhibited to the jury like an injured or broken leg or a lost eye. There was no optical evidence of the injury itself. Whether there was an injury, its character and extent, were questions for the jury to decide, and this decision should be based upon legitimate evidence. That there was competent evidence tending to establish that plaintiff was hurt at the time, place, and in the manner claimed, and that the injury was substantial, is not questioned. However, it consists largely of the testimony of plaintiff.

Some things appear in the record that cast suspicion on the sincerity of plaintiff's conduct during the trial, and induces the belief that it all might have been done for the purpose of working on the jury's sympathy. If, in the twenty-two months between the accident and the trial, anyone ever saw plaintiff suffering from hysteria, or heard of it, it was not shown. Neither was it in evidence that during that time he was in the habit of changing at short intervals, as at the trial, from a sitting to a reclining posture for comfort, or ease, or anything else. On the other hand, we have learned from him that soon after his alleged injury he left Kingman and went to Phoenix, where he conducted a store for six or seven months; that he then returned to Kingman and went upon a fruit orchard and did light work; that at no time did he place himself under the regular care of a doctor for treatment until just before and during the trial, when he secured the professional services of Dr. Todt.

It seems to us that a large part of the evidence presented to the jury to make out his case was the erratic conduct of plaintiff, and that it might have been adopted for the purpose of exaggerating his injury. That he was sophisticated in the matter of claiming damages appears from the fact that in 1923

he brought suit against the Miami Copper Company, of Miami, for damages to his ear; against the Old Dominion Copper Company, of Globe, for damages for injury to his back in March, 1924; and at an earlier date claimed damages of the Copper Queen · for an injury to his head. When, however, he was asked if he had ever made "claim for compensation or damages" he answered, "Never," and only admitted he had when confronted with the record or witnesses cognizant of the facts.

We think the record is so shot with error as to require a new trial. The order is that the judgment be reversed, and the cause remanded.

LOCKWOOD and McALISTER, JJ., concur.